EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Kendall Hope Tucker<br><br>Recurrida<br><br>v.<br><br>Money Group, LLC y otros<br><br>Peticionarios | Certiorari<br><br>2026 TSPR 9<br><br>217 DPR ___ |

Número del Caso: CC-2024-0391

Fecha: 27 de enero de 2026

Tribunal de Apelaciones

    Panel VII

Representantes legales de la parte peticionaria:

    Lcda. Carla García Benítez
    Lcdo. Carlos George
    Lcda. Patricia Torres Castellano
    Lcdo. Alejandro J. García Carballo
    Lcda. Laura G. Brenes Parra

Representantes legales de la parte recurrida:

    Lcdo. Orlando Castro García
    Lcdo. Héctor Torres Jorge

Materia: Arbitraje; Obligaciones y Contratos – Obligatoriedad de los acuerdos de arbitraje pactados válidamente en contratos suscritos entre partes individuales frente a reclamaciones por discrimen instadas al amparo de la Ley Núm. 100.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Kendall Hope Tucker

    Recurrida

        v.                CC-2024-0391     Certiorari

Money Group, LLC y otros

    Peticionarios


Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo


En San Juan, Puerto Rico, a 27 de enero de 2026.

En *Quiñones v. Asociación*, 161 DPR 668 (2004), tuvimos la oportunidad de evaluar el alcance de un acuerdo de arbitraje que formaba parte de un convenio colectivo, frente a una reclamación instada al amparo de la Ley Núm. 100, *infra*. Allí, determinamos que, aunque se incluya un lenguaje sobre la exclusividad de un foro arbitral, será opción del obrero reclamante recurrir al foro judicial o al de arbitraje. A diferencia de *Quiñones v. Asociación, supra,* hoy nos corresponde evaluar el alcance de una cláusula de arbitraje frente a una reclamación por discrimen, pero en esta ocasión, en el contexto de un contrato suscrito entre partes individuales.

Adelantamos que, cónsono con lo resuelto por el Tribunal Supremo de Estados Unidos en *Gilmer v. Interstate/Johnson Lane Corp.*, 500 US 20(1991), y por las disposiciones pertinentes del *Federal Arbitration Act*, los contratos suscritos entre partes individuales que contengan acuerdos de arbitraje pactados válidamente serán obligatorios, incluso frente a reclamaciones instadas por discrimen al amparo de la Ley Núm. 100, *infra*. Veamos.

**I**

La relación de empleo entre la Sra. Kendall Hope Tucker (señora Hope Tucker o Recurrida) y Money Group, LLC (Money Group o Peticionaria) se formalizó contractualmente a finales del año 2020, luego de que Money Group adquiriera a Polis, Inc., una compañía fundada por la Recurrida que se enfoca en ventas presenciales y análisis de datos o *"in-person sales and analytics"*.[1]

Para llevar a cabo la adquisición de Polis, Inc., la señora Hope Tucker y Money Group suscribieron un *Stock Purchase Agreement* mediante el cual esta última adquirió la totalidad de las acciones de Polis, Inc. Paralelamente, Money Group contrató como empleada a la Recurrida para ocupar la plaza de

---

[1] Según surge de la *Demanda* incoada por la señora Hope Tucker, Polis, Inc, también conocida como Knoq, ha sido utilizado por Google Fiber, NRG, Inspire Energy, Fluent Home Security y muchas otras marcas muy respetadas de productos directos al hogar (*direct to home brands*). Debido a lo anterior, la Recurrida puede ser considerada como una líder en el ámbito del análisis de datos o *"in-person sales and analytics"*. Incluso, fue seleccionada dentro de los "*30 Under 30*" de la Revista Forbes en 2017. Además, antes de su adquisición por Money Group, la señora Hope Tucker creó varios equipos en diversos estados de los Estados Unidos, haciendo de Polis, Inc. una compañía de alcance nacional.

"*Head of Data and Strategy*".[2] A esos efectos, las partes suscribieron un *Employment Agreement* (Contrato de Empleo), el cual es objeto de la controversia que nos ocupa. **De particular relevancia es que, en dicho contrato, las partes pactaron que cualquier disputa relacionada con el empleo se resolvería mediante un proceso de arbitraje.**[3]

Luego de una serie de desavenencias, el 16 de noviembre de 2022, la Recurrida presentó una *Demanda* contra Money Group por despido injustificado, discrimen y represalias al amparo de la Ley Núm. 80 del 30 de mayo de 1976, según enmendada, 31 LPRA sec. 185a *et seq.*, Ley Sobre Despidos Injustificados (Ley Núm. 80), la Ley Núm. 100 del 30 de junio de 1959, según enmendada, 29 LPRA sec. 146 *et seq.*, Ley Antidiscrimen de Puerto Rico, (Ley Núm. 100) y la Ley Núm. 115 de 20 de diciembre de 1991, según enmendada, 29 LPRA sec. 194 *et seq.*, Ley contra el Despido Injusto o Represalias a todo Empleado por Ofrecer Testimonio ante un Foro Legislativo, Administrativo o Judicial (Ley Núm. 115) en el Tribunal de Primera Instancia, Sala Superior de San Juan.

---

[2] En su función como *Head of Data and Strategy*, la señora Hope Tucker era responsable de un "*outreach center business unit*" que contribuía al desarrollo de Money Group a través del comercio interestatal. En específico, la labor de la Peticionaria conllevaba un acercamiento a consumidores en diversas jurisdicciones de Estados Unidos.

[3] En lo pertinente, el párrafo 14 del Contrato de Empleo disponía lo siguiente:
*All Disputes. All Disputes relating to this Agreement and the relationship of the parties hereto shall be settled and finally determined by arbitration in San Juan, Puerto Rico, by, and in accordance with, the Laws of the Commonwealth of Puerto Rico. A single arbitrator situated in San Juan, Puerto Rico shall be used.*

Como corolario, Money Group presentó una *Comparecencia especial para compeler arbitraje y solicitud de desestimación sumaria* en la que alegó que el foro de primera instancia carecía de jurisdicción para atender la acción incoada por la señora Hope Tucker. Destacó que las partes contaban con un acuerdo de arbitraje válido y vinculante. Para fundamentar su *Comparecencia*, Money Group expuso que el *Federal Arbitration Act* (FAA) aplica a contratos y cláusulas de arbitraje en la jurisdicción del Estado Libre Asociado de Puerto Rico y, cónsono con esa Ley, los tribunales tenían la obligación de reconocer la validez de una cláusula de arbitraje en un contrato. Añadió que el Tribunal Supremo de los Estados Unidos confirmó que las disposiciones del FAA aplicarían en el contexto del empleo. Debido a ello, sostuvo que el foro primario estaba obligado a compeler a la Recurrida a arbitrar sus reclamaciones contra Money Group.

En desacuerdo con la postura de Money Group, la señora Hope Tucker presentó una *Oposición a comparecencia especial para compeler arbitraje y solicitud de desestimación sumaria*. Allí, expuso que a pesar de que el Contrato de Empleo suscrito contenía una cláusula de arbitraje, la principal reclamación era una de discrimen por razón de sexo al amparo de la Ley Núm. 100, *supra*. Según la señora Hope Tucker, el Tribunal de Primera Instancia ostentaba jurisdicción para atender su reclamación y no sería necesario acatarse al acuerdo de arbitraje.

Para fundamentar su *Oposición*, la Recurrida también hizo referencia a lo resuelto por este Tribunal en *Quiñones v.*

*Asociación*, *supra*. Según esta, allí se determinó que los tribunales conservan jurisdicción para entender en los casos de despido patronal discriminatorio por razón de edad desde el primer momento en que surja la causa de acción, aunque se hubiera establecido lo contrario en el convenio colectivo.

Enfatizando el error de la Recurrida al incoar su acción en el foro de primera instancia, Money Group presentó una *Réplica a Oposición a comparecencia especial para compeler arbitraje y solicitud de desestimación sumaria*. En esta señaló que, aunque existía jurisprudencia que establecía que las reclamaciones bajo la Ley Núm. 17, *infra*, —la cual prohíbe el hostigamiento sexual— no estaban sujetas a arbitraje, en este caso la Recurrida fundamentó sus reclamaciones en la Ley Núm. 100, *supra*, que prohíbe el discrimen por razón de sexo.

Además, para refutar el argumento que utilizó la señora Hope Tucker al citar a *Quiñones v. Asociación*, *supra*, Money Group añadió en su *Réplica* que el presente caso era distinguible de *Quiñones v. Asociación*, *supra*, toda vez que no se trata de un convenio colectivo, sino de un acuerdo entre la Recurrida y Money Group. Según la Peticionaria, lo resuelto en *Quiñones v. Asociación*, *supra*, y su progenie no aplicaba a situaciones donde el empleado pactó, mediante contrato individual, cómo y dónde se ventilarían las controversias relacionadas a su empleo.

Finalmente, la señora Hope Tucker presentó una *Moción para replicar escrito Réplica a Oposición a comparecencia especial para compeler arbitraje y solicitud de desestimación*

sumaria. En esta última moción, recalcó que el Artículo 4 de la Ley Núm. 100, *supra*, era categóricamente claro al disponer que el Tribunal de Primera Instancia poseía jurisdicción y era el foro indicado para atender las reclamaciones incoadas al amparo de dicho estatuto, independientemente de la existencia de una cláusula de arbitraje.[4]

Así las cosas, el Tribunal de Primera Instancia emitió una *Resolución* en la que declaró "No Ha Lugar" la *Comparecencia Especial para Compeler Arbitraje y Solicitud de Desestimación Sumaria*. Como fundamento, el foro de primera instancia expresó que, a pesar de que en nuestro ordenamiento jurídico existía una fuerte política pública a favor del arbitraje, se habían reconocido excepciones a la obligación de arbitrar. Haciendo referencia a lo resuelto en *Quiñones v. Asociación*, *supra*, el juzgador de instancia añadió que la Recurrida no estaba obligada a arbitrar tales controversias, ni a agotar remedios administrativos, previo a litigar su caso en los tribunales.

En desacuerdo con el proceder del foro primario, Money Group acudió ante el Tribunal de Apelaciones. Sin embargo, amparándose en la Regla 40 del Reglamento del Tribunal de Apelaciones, ese foro se rehusó a expedir el *certiorari* presentado por Money Group. Según el foro apelativo intermedio,

---

[4] El Artículo 4 de la Ley Núm. 100 del 30 de junio de 1959, 29 LPRA sec. 149, dispone lo siguiente:

El Tribunal de Primera Instancia y el Tribunal de Distrito tendrán jurisdicción original concurrente en los casos que surgieren bajo esta Ley. Las reclamaciones civiles podrán tramitarse por acción ordinaria o mediante el procedimiento de querella establecido por la Ley Núm. 10 de 14 de noviembre de 1917, según ha sido o fuere posteriormente enmendada. Podrán acumularse en una sola acción las reclamaciones que tuvieren varios o todos los trabajadores o empleados o aspirantes a empleo contra un patrono común o una organización obrera común. […]

el expediente no evidenció la comisión de falta alguna por el Tribunal de Primera Instancia.

Ante esa coyuntura, Money Group recurrió ante nosotros y señaló que el foro apelativo intermedio erró al abstenerse de expedir el auto de *certiorari* y, por consiguiente, rehusarse a desestimar la reclamación laboral de la señora Hope Tucker y permitir indebidamente su ventilación en el foro judicial.

Expuesto el cuadro fáctico que antecede, procederemos a repasar la doctrina jurídica pertinente a la controversia planteada. Ello es a los fines de determinar si en una reclamación por discrimen al amparo de la Ley Núm. 100, *supra*, en la que medie un acuerdo de arbitraje, se debe ventilar en el foro judicial o se debe compeler el arbitraje. Además, expondremos la teoría general contractual de nuestro ordenamiento jurídico para auscultar las consecuencias del acuerdo pactado entre la señora Hope Tucker y Money Group.

**II**

**A. El arbitraje y las reclamaciones por discrimen al amparo de Ley Núm. 100, *supra*.**

De entrada, al hablar de un acuerdo de arbitraje, nos referimos a cuando dos partes se obligan contractualmente, y de manera voluntaria a someter su disputa a un tercero reconocido por ambos como imparcial y capacitado para decidir de manera justa. Este tercero neutral, también conocido como árbitro, tendrá entonces el deber de resolver el conflicto

mediante un laudo que tiene efecto final y obligatorio entre las partes.[5] Así, pues, tal y como hemos expuesto: "[e]l arbitraje es un método alterno para la solución de conflictos, y su propósito es que las partes presenten sus controversias ante un ente neutral (un árbitro o un panel de árbitros) con autoridad para adjudicar e imponer una decisión a las partes".[6]

Con lo anterior en mente, debemos repasar varias disposiciones del *Federal Arbitration Act* (FAA, por sus siglas en inglés).[7] Lo anterior responde a que ese estatuto aplica a los acuerdos de arbitraje en la jurisdicción del Estado Libre Asociado de Puerto Rico que satisfacen dos criterios: (1) la existencia de un acuerdo de arbitraje válido; y (2) que ese acuerdo afecte el comercio interestatal.[8]

Cabe destacar que el Tribunal Supremo de Estados Unidos ha determinado que el término "comercio", según utilizado en la Sección 2 de la FAA, equivale a cualquier actividad que afecte el comercio interestatal.[9] Asimismo, hemos aclarado que los acuerdos de arbitraje que afecten el comercio estatal serán regulados por la FAA y, por consiguiente, las disposiciones de ese estatuto ocuparán el campo. A su vez, una consecuencia fundamental de la aplicación de la FAA es el desplazamiento de

---

[5] D.M. Helfeld, *La jurisprudencia creadora: factor determinante en el desarrollo del derecho de arbitraje en Puerto Rico*, 70 (Núm. 1) Rev. Jur. U.P.R. 1, 3 (2001).

[6] *Aquino González v. AEELA*, 182 DPR 1, 19 (2011).

[7] 9 USCA sec. 1 *et seq*.

[8] *Aponte Valentín et al. v. Pfizer Pharm.*, 208 DPR 263 (2021).

[9] Véase *Citizens Bank v. Alafabco, Inc.*, 539 US 52 (2003).

cualquier reglamentación estatal que discrimine, de su faz, contra el arbitraje.[10]

Conforme a la sección 4 de dicho estatuto, si un tribunal determina que el acuerdo se hizo por escrito y que existe un incumplimiento al proceder conforme al mismo, tiene el deber de ordenar el arbitraje según lo pactado.[11] A esos efectos, el Tribunal Supremo de Estados Unidos determinó que el FAA: "*leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed*".[12] Es decir, los tribunales de distrito no tienen discreción en estos casos, sino que deben ordenar a las partes a acudir al arbitraje cuando exista un acuerdo válido.

Expuesto lo anterior, destacamos que con la aprobación de este estatuto, "el Congreso se aseguró que las cláusulas de arbitraje fueran evaluadas y validadas como cualquier otra cláusula contractual, teniendo en cuenta la autonomía contractual de las partes, e **instituyendo así una vigorosa**

---

[10] La jurisprudencia federal ha reconocido cuatro instancias en las cuales aplica la doctrina del campo ocupado. Estas son: (1) cuando existen leyes estatales que obstaculizan los objetivos del Congreso; (2) cuando la intención del Congreso es la de ocupar el campo de la legislación estatal; (3) cuando la naturaleza del tema a ser legislado amerita uniformidad a nivel nacional; y (4) cuando existe un conflicto directo entre la legislación estatal y federal. Véase *Gade v. National Solid Wastes Management Ass'n*, 505 US 88 (1992); *Arizona v. United States*, 567 US 387 (2012); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 US 132 (1963); *Rice v. Santa Fe Elevator Corp.*, 331 US 218 (1947); *Hines v. Davidowitz*, 312 US 52 (1941).

[11] 9 USC sec. 4.

[12] *Dean Witter Reynolds, Inc., v. Byrd*, 470 US 213, 218 (1985).

**política pública nacional a favor del arbitraje**".[13] Asimismo, hemos expresado que en Puerto Rico, igualmente, existe una vigorosa política pública a favor del arbitraje.[14] Debido a ello, hemos resuelto que, toda duda sobre si procede o no el arbitraje debe resolverse a favor de este conforme haya sido pactado.[15]

Inclusive con la existencia de una fuerte política pública a favor del arbitraje, no se podrá recurrir a este mecanismo, salvo con la existencia de un pacto válido entre las partes.[16] Lo anterior es cónsono con el principio reiterado de que el arbitraje es una figura jurídica inherentemente contractual.[17] Dado que el arbitraje es una figura de naturaleza contractual, no se puede obligar a una parte a someter una disputa al procedimiento de arbitraje salvo se haya pactado de esa forma.[18]

Por otro lado, hemos resuelto que la determinación sobre si las partes están obligadas a arbitrar es inherentemente una tarea judicial.[19] En la ejecución de esa tarea, hemos determinado que debemos auscultar lo siguiente: (1) si existe un convenio de arbitraje; (2) si ese convenio alcanza

---

[13] Negrilla suplida. *Medina v. Cruz Azul de P.R.*, 155 DPR 735, 742 (2001).

[14] *Constructora Estelar v. Aut. Edif. Pub.*, 183 DPR 1 (2011).

[15] *Aponte Valentín et al. v. Pfizer Pharm., supra*, en la pág. 282.

[16] *S.L.G. Méndez-Acevedo v. Nieves Rivera*, 179 DPR 359 (2010).

[17] Íd., en la pág. 367.

[18] Íd., en la pág. 368.

[19] Íd., en la pág. 367.

determinada controversia; y (3) si el convenio alcanza una disputa sobre la duración o expiración del contrato.[20]

Si bien es cierto que, en nuestra jurisdicción contamos con una fuerte política pública a favor del arbitraje, también debemos considerar una serie de excepciones que impiden acudir de manera exclusiva al foro de arbitraje.

i. *Quiñones v. Asociación*, *supra*, **y las excepciones al arbitraje compulsorio**

A grandes rasgos, la FAA contiene una excepción en cuanto a qué tipo de contratos se encuentran exentos de las disposiciones de ese estatuto. Ello se refiere al trabajo en la industria de la transportación. En específico, la Sección 1 del FAA dispone que "*[n]othing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce*" (nada de lo aquí dispuesto será aplicable a los contratos de empleo de marineros, empleados ferroviarios u otra clase de trabajadores dedicados al comercio exterior o interestatal).[21]

Por otro lado, en Puerto Rico también se han reconocido una serie de excepciones en las que no procede aplicar una cláusula de arbitraje en el contexto laboral. Estas son: (1) cuando las partes renuncian voluntariamente al derecho de

---

[20] *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, en la pág. 368.

[21] 9 USC sec. 1. Véase además *Southwest Airlines Co. v. Saxon*, 596 US 450 (2022).

arbitrar sus reclamos; (2) en caso de pertenecer a una unión, cuando esta falta a su deber de proveer a sus representados justa representación; (3) cuando recurrir al arbitraje constituye un gesto fútil; (4) cuando se trata de una reclamación por hostigamiento sexual al amparo de la Ley Núm. 17 de 22 de abril de 1988, 29 LPRA sec. 155; y (5) cuando la causa de acción es por despido discriminatorio bajo un convenio colectivo (en el contexto de uniones obreras).[22]

Ahora bien, es menester detenernos brevemente en la quinta excepción. A saber, cuando se trate de una acción por despido discriminatorio y quien insta el recurso se encuentra cobijado por un convenio colectivo. Esto se debe a que la señora Hope Tucker y los foros recurridos se han amparado precisamente en esa excepción para sostener que la reclamación incoada por la Recurrida no debe ventilarse en el foro de arbitraje. En específico, han hecho referencia en múltiples ocasiones a lo resuelto en *Quiñones v. Asociación*, *supra*. En vista de ello, repasemos lo que este Tribunal decidió en aquella ocasión.

En *Quiñones v. Asociación*, *supra*, el Sr. Sixto Quiñones González (Quiñones) laboró como guardia de seguridad por un largo periodo de tiempo en el Condominio Playa Azul II en Luquillo, Puerto Rico. A diferencia de la Recurrida, el empleo de Quiñones estaba cubierto por el Convenio Colectivo suscrito entre la Asociación de Condómines Playa Azul II (Asociación).

---

[22] Véase *H.R. Inc. v. Vissepó & Diez Constr.*, 190 DPR 597 (2014); *Quiñones v. Asociación*, *supra*; *Medina v. Cruz Azul de P.R.*, *supra*; y *Vélez v. Serv. Legales de P.R., Inc.*, 144 DPR 673 (1998).

Una vez la Asociación decide prescindir de los servicios de Quiñones, este los demanda al amparo de la Ley Núm. 80, *supra*, y la Ley Núm. 100, *supra*. En oposición, tal y como ocurrió en el caso de autos, la Asociación solicitó la desestimación de la demanda debido a que, según ella, el Convenio Colectivo proveía para el arbitraje. Sin embargo, Quiñones argumentó que podía obviar el procedimiento de arbitraje y acudir directamente al foro judicial.

En aquella ocasión, determinamos que, en el contexto de un empleado unionado amparado por un Convenio Colectivo, "[a]un cuando el Convenio Colectivo incluya la alternativa del arbitraje privado, los tribunales conservarán jurisdicción para entender en ellos desde el primer momento en que surja la causa de acción, independientemente de lo establecido en el Convenio Colectivo".[23] Nótese que en ningún momento se hace alusión a una excepción de carácter general que abarque a todo tipo de empleado, sino que *Quiñones v. Asociación*, *supra*, se limita a crear una norma que cobija únicamente a empleados unionados.

Expuesto lo resuelto en *Quiñones v. Asociación, supra*, debemos voltear la mirada a un caso resuelto en el Tribunal Supremo de Estados Unidos en que también se abundó sobre la excepción arbitral contemplada en el referido caso. Nos referimos a *Gilmer v. Interstate/Johnson Lane Corp.*, *supra*. Veamos los detalles.

---

[23] *Quiñones v. Asociación*, *supra*, en la pág. 676.

### i. *Gilmer v. Interstate/Johnson Lane Corp.*, *supra*.

En *Gilmer v. Interstate/Johnson Lane Corp.*, *supra*, al igual que en el caso de autos, el Tribunal Supremo de Estados Unidos se enfrentó a una controversia en la que el demandante, Robert Gilmer (Gilmer), era un empleado que suscribió un contrato privado de empleo con su patrono. Mediante ese contrato, Gilmer acordó que cualquier disputa que surgiera de dicho contrato se atendería en arbitraje. Sin embargo, al igual que la señora Hope Tucker, una vez Gilmer culminó sus labores y, actuando en contravención del acuerdo de arbitraje, acudió al foro judicial y presentó una reclamación por discrimen en contra de su antiguo patrono, al amparo del *Age Discrimination in Employment Act* (ADEA), 28 USCA sec. 623.

Lo que resulta particularmente curioso es que en los foros inferiores, el resultado de Gilmer fue prácticamente idéntico al de la Recurrida. Entiéndase, que el Tribunal de Distrito federal concluyó que ostentaba jurisdicción concurrente con el foro de arbitraje para atender la causa de acción que presentó Gilmer. El foro primario federal fundamentó su determinación en *Alexander v. Gardner-Denver Co.,* 415 U.S. 36 (1974). Sin embargo, tal y como resolvió eventualmente el Tribunal Supremo de Estados Unidos, *Alexander v. Gardner-Denver Co., Íd.,* giraba en torno a la relación entre un patrono y los miembros de una unión obrera. Debido a ello, el Tribunal Supremo federal revocó al Tribunal de Distrito federal y expresó que lo resuelto en *Alexander v. Gardner-Denver Co., Íd.,* no aplicaba a los hechos que presentó Gilmer.

Como resultado de lo anterior, el Tribunal Supremo de Estados Unidos resolvió que una cláusula de arbitraje en un contrato de empleo privado regido por la FAA no es incompatible con la ley ADEA.[24] Sobre ese particular, el Tribunal Supremo federal dispuso que, "*Congress, however, did not explicitly preclude arbitration or other nonjudicial resolution of claims, even in its recent amendments to the ADEA*" (el Congreso, sin embargo, no prohibió expresamente el arbitraje ni otros mecanismos extrajudiciales de resolución de reclamaciones, ni siquiera en sus enmiendas más recientes a la ADEA).[25]

Lo pertinente y fundamental para el caso de autos es que el Tribunal Supremo de Estados Unidos clarificó que **lo dispuesto en *Alexander v. Gardner-Denver Co., Íd*., no aplicaba fuera del contexto de un convenio colectivo**. Ello se debe a que los tribunales no pueden descansar en ese caso para ignorar las cláusulas de arbitraje cuando no se trata de un empleado unionado.[26]

Ahora bien, aclarada la forma en la que se deben resolver este tipo de disputas en la jurisdicción federal, debemos tomar en consideración el Art. 2.13 de la *Ley de Transformación y Flexibilidad Laboral*, Ley Núm. 4-2017, 29 LPRA sec. 1221. Este reza lo siguiente:

> [T]oda ley o reglamento de Puerto Rico que regule las relaciones entre un patrono y un

---

[24] *Gilmer v. Interstate/Johnson Lane Corp.*, *supra*.

[25] Íd., en la pág. 29.

[26] Íd., en la pág. 33.

empleado que se refiera a un asunto similar a lo regulado por una ley aprobada por el Congreso de los Estados Unidos de América o un reglamento emitido al amparo de una ley federal, se interpretará de manera consistente con dichas normas federales, salvo que la ley de Puerto Rico expresamente requiera una interpretación distinta.[27]

Con el precitado artículo en mente, pasemos a evaluar una guía emitida por el Departamento del Trabajo y Recursos Humanos de Puerto Rico (DTRH) dirigida a orientar a la ciudadanía, sean patronos o empleados, en cuanto a la legislación laboral aplicable en Puerto Rico.

## ii. Guías de interpretación de la legislación que prohíbe el discrimen en el empleo en Puerto Rico

El 13 de septiembre de 2024, el DTRH publicó la primera edición de las *Guías de interpretación de la legislación que prohíbe el discrimen en el empleo en Puerto Rico*. Allí, entre muchas otras cosas, expuso una serie de detalles que tomaremos en consideración para la resolución de la presente controversia.

Por ejemplo, las *Guías* del DTRH resaltan que este Tribunal reconoció en *Quiñones v. Asociación*, *supra*, que los foros judiciales conservan jurisdicción para entender en los casos de despido patronal discriminatorio por razón de edad desde el primer momento en que surja la causa de acción, aunque se hubiera establecido lo contrario en el convenio colectivo.

---

[27] Art. 2.13 de la *Ley de Transformación y Flexibilidad Laboral*, Ley Núm. 4-2017, 29 LPRA sec. 1221.

Contrario a lo anterior y, al igual que aclaramos anteriormente, las *Guías* señalan que en aquellos casos en los que las partes acordaron que el arbitraje se regirá por la FAA, dicho estatuto prevalece. Como expusimos en secciones anteriores, ese estatuto ocupa el campo y, por lo tanto, las reclamaciones, incluyendo aquellas bajo la Ley Núm. 100, se han de someter a arbitraje.

Consecuentemente, cuando el acuerdo de arbitraje está suscrito bajo la FAA, en esos casos se ocupó el campo y las reclamaciones bajo la Ley Núm. 100, *supra*, tienen que ser sometidas al proceso de arbitraje. A modo de recordatorio, para que un acuerdo de arbitraje sea considerado suscrito al amparo de las disposiciones del FAA, bastará con que sea un acuerdo de arbitraje válido que, a su vez, incida de alguna forma con el comercio interestatal.

Ahora bien, el Tribunal Supremo de Estados Unidos ha resuelto que los foros judiciales pueden invalidar un acuerdo de arbitraje bajo las mismas defensas que aplican a todo contrato.[28] Entonces, para determinar la validez de un acuerdo de arbitraje bajo la FAA, los tribunales deben remitirse a las normas de derecho contractual de la jurisdicción correspondiente. Por consiguiente, procedemos a evaluar dichas normas.

---

[28] *Doctor's Associates, Inc. v. Casarotto*, 517 US 681 (1996).

**B. Teoría general contractual**

Es norma reiterada que, a la luz del principio *pacta sunt servanda*, los contratos tienen fuerza de ley entre las partes.[29] Así, pues, "[c]uando las personas contratan[,] crean normas obligatorias; tan obligatorias como la ley misma".[30] Asimismo, las relaciones contractuales se rigen por el principio de la autonomía de la voluntad que emana del Art. 1232 del Código Civil de Puerto Rico de 2020 (Código Civil). Según este, "[l]as partes pueden acordar cualquier cláusula que no sea contraria a la ley, a la moral o al orden público".[31]

Ahora bien, en cuanto a la interpretación de las cláusulas del acuerdo suscrito entre los contratantes, el Código Civil dispone que "[s]i los términos de un negocio jurídico bilateral son claros y no dejan duda sobre la intención de las partes, se estará al sentido literal de sus palabras".[32] Brindándole la deferencia que merecen, hemos expresado que "se debe seguir la letra clara del contrato, cuando ésta refleja inequívocamente la voluntad de las partes".[33] Además, de darse el caso de que el juzgador se tenga que adentrar a interpretar la intención de las partes, se atenderán principalmente los

---

[29] Art. 1233 del Código Civil de Puerto Rico de 2020 (31 LPRA sec. 9754).

[30] J.R. Vélez Torres, *Derecho de contratos*, San Juan, Ed. Revista Jurídica UIPR, 1990, T. IV, Vol. II, pág. 99.

[31] Art. 1232 del Código Civil de 2020 (31 LPRA sec. 9753).

[32] Art. 354 del Código Civil de 2020 (31 LPRA sec. 6342).

[33] *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713, 726 (2001).

actos de los contratantes, coetáneos y posteriores a la otorgación del acuerdo.[34]

Por otro lado, este Tribunal ha expresado que las normas que rigen las relaciones contractuales "convergen con el principio de la buena fe contractual, el cual está latente en todo nuestro ordenamiento".[35] Consecuentemente, "al momento de interpretar un contrato es preciso presuponer lealtad, corrección y buena fe en su redacción, e interpretarlo de manera tal que lleve a resultados conformes a la relación contractual y que estén de acuerdo con las normas éticas".[36]

Expuesta la normativa jurídica que enmarca la controversia de epígrafe, procedemos a resolver el recurso ante nuestra consideración.

**III**

A manera de síntesis, la Peticionaria acudió ante este Tribunal en busca de tres remedios. Estos son: (1) que revoquemos las *Resoluciones* emitidas por el Tribunal de Primera Instancia y el Tribunal de Apelaciones; (2) que pongamos en vigor la cláusula de arbitraje pactada entre la señora Hope Tucker y Money Group en el Contrato de Empleo; y (3) que ordenemos al foro de primera instancia a compeler a la Recurrida a arbitrar sus reclamaciones laborales en contra de Money Group.

---

[34] Art. 354 del Código Civil de 2020 (31 LPRA sec. 6342). Véase *C.F.S.E. v. Unión de Médicos*, 170 DPR 443 (2009).

[35] *VDE Corporation v. F&R Contractors*, 180 DPR 21 (2010).

[36] *S.L.G. Irizarry v. S.L.G. García*, *supra*, en la pág. 726.

Los reclamos de Money Group redundan en la validez de la cláusula de arbitraje que formó parte del Contrato de Empleo suscrito entre la Peticionaria y la Recurrida. Luego de un análisis exhaustivo de la jurisprudencia y legislación aplicable a la controversia de autos, concluimos que el acuerdo de arbitrar pactado entre la señora Hope Tucker y Money Group fue válido y vinculante. Debido a lo anterior, el Tribunal de Primera Instancia se veía obligado a desestimar la acción incoada por la Recurrida y, en su lugar, compeler el arbitraje. Veamos los fundamentos.

¿Cuál era la cuestión fundamental que imperaba resolver para determinar si la acción de la señora Hope Tucker se debía ventilar en el foro de arbitraje? En primer lugar, se debía auscultar si el acuerdo de arbitraje fue pactado conforme a las disposiciones del FAA. Para ello, se debió analizar únicamente dos variables: (1) que fuese un acuerdo de arbitraje pactado válidamente y (2) que incidiera sobre el comercio interestatal.

La validez de lo pactado no se encuentra en controversia. En cuanto a si incide o no sobre el comercio interestatal, surge de la propia demanda que Money Group siempre ha brindado servicios a distintos estados de Estados Unidos. Igualmente, el Contrato de Empleo suscrito por la Recurrida expone que esta iba a ser responsable de contribuir al desarrollo de Money Group a través del comercio interestatal. Esto se debe a que sus labores conllevaban un acercamiento a consumidores en diversas jurisdicciones, dándole así continuidad a los servicios que brindaba Money Group a través de los distintos estados de

Estados Unidos. En vista de lo anterior, no albergamos duda en cuanto a que la FAA aplica al acuerdo de arbitraje pactado entre la señora Hope Tucker y Money Group.

Ahora bien, siendo el acuerdo de arbitraje pactado entre Money Group y la Recurrida uno que afecta el comercio interestatal y, por consiguiente, regulado por la FAA, hemos expresado que las disposiciones del referido estatuto ocuparán el campo. Como mencionamos en la sección anterior, una consecuencia fundamental de la aplicación de la FAA es el desplazamiento de cualquier regulación estatal que discrimine, de su faz, contra el arbitraje.

A pesar de lo anterior, el foro de primera instancia nada mencionó sobre la aplicación de la FAA y las consecuencias que acabamos de exponer. En su lugar, determinó erradamente que aplicaba la excepción a arbitrar dispuesta en *Quiñones v. Asociación*, *supra*. Sin embargo, según mencionamos, ese caso aplica únicamente a obreros unionados que estén cobijados por un convenio colectivo.

Añadimos que, al revisar las excepciones en las que un acuerdo de arbitraje no es obligatorio, no encontramos ninguna que aplique al caso de autos. Contrario a lo señalado por la Recurrida, las causas de acción incluidas en su demanda no prohíben de manera automática el arbitraje. Así, pues, al no estar presentes ninguna de las limitadas excepciones reconocidas, aplica el principio básico que requiere que, una

vez se establece la existencia de un acuerdo de arbitraje válido y exigible, los tribunales den cumplimiento a lo acordado.

El Tribunal Supremo de Estados Unidos se pronunció sobre este principio básico en *Gilmer v. Interstate/Johnson Lane Corp., supra*. Allí, el Tribunal Supremo federal cerró la puerta a los intentos de extender una normativa análoga a la de *Quiñones v. Asociación, supra*, a los contratos de empleo privado. La norma que surge claramente de leer ambos casos es que las cláusulas de arbitraje en los convenios colectivos son opcionales, pero aquellas en los contratos de empleo privados son obligatorias. Debido a ello, concluimos que, cónsono con lo resuelto en *Gilmer v. Interstate/Johnson Lane Corp., supra*, las cláusulas de arbitraje en los contratos de empleo privado son plenamente exigibles.

Recapitulando, la reclamación de discrimen instada por la señora Hope Tucker fue al amparo de la Ley Núm. 100, *supra*. De manera análoga, la acción evaluada en el Tribunal Supremo de Estados Unidos en *Gilmer v. Interstate/Johnson Lane Corp., supra*, fue al amparo de la ADEA. En este último caso se determinó que nada en la ADEA impedía acudir al foro de arbitraje en busca de resolver las disputas.

Así, tomamos en cuenta que el Art. 2.13 de la Ley Núm. 4-2017, *supra*, dispone que la Ley Núm. 100, *supra*, se debe interpretar de manera consistente con ADEA, concluimos entonces que las partes individuales que suscriban válidamente un acuerdo de arbitraje al amparo de la FAA estarán obligadas a

presentar sus reclamaciones en el foro arbitral, salvo que concurra alguna de las excepciones reconocidas en esta *Opinión*.

## VI

Por los fundamentos expuestos, se revoca la determinación del Tribunal de Apelaciones, al igual que la *Resolución* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan. Devolvemos el caso al Tribunal de Primera Instancia a los fines de declarar *Ha Lugar* a la *Comparecencia especial para compeler arbitraje y solicitud de desestimación sumaria* presentada por Money Group, LLC. y, consecuentemente, compeler a la Sra. Kendall Hope Tucker a arbitrar sus reclamaciones laborales en contra de Money Group, LLC.

Se dictará Sentencia de conformidad.

Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Kendall Hope Tucker

    Recurrida

        v.                 CC-2024-0391     Certiorari

Money Group, LLC y otros

    Peticionarios

SENTENCIA

En San Juan, Puerto Rico, a 27 de enero de 2026.

Por los fundamentos antes expuestos en la Opinión que antecede la cual se hace formar parte íntegra de la presente, se revoca la determinación del Tribunal de Apelaciones, al igual que la *Resolución* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan. Devolvemos el caso al Tribunal de Primera Instancia a los fines de declarar *Ha Lugar* a la *Comparecencia especial para compeler arbitraje y solicitud de desestimación sumaria* presentada por Money Group, LLC. y, consecuentemente, compeler a la Sra. Kendall Hope Tucker a arbitrar sus reclamaciones laborales en contra de Money Group, LLC.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo Interina. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión Disidente. El Juez Asociado señor Estrella Martínez emitió una Opinión Disidente a la cual se unió la Jueza Presidenta Oronoz Rodríguez. El Juez Asociado señor Colón Pérez emitió una Opinión Disidente.

Bettina Zeno González
Secretaria del Tribunal Supremo Interina

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Kendall Hope Tucker

     Recurrida

       v.

Money Group,LLC y otros

     Peticionarios

CC-2024-0391

La Jueza Presidenta ORONOZ RODRÍGUEZ emitió una Opinión disidente

En San Juan, Puerto Rico a 27 de enero de 2026.

Hoy, una mayoría de este Tribunal adopta lo resuelto por la Corte Suprema federal en _Gilmer v. Interstate/Johnson Lane Corp._, 500 US 20 (1991) para pautar que las cláusulas de arbitraje en los contratos de empleo privado son plenamente exigibles, aun cuando estamos ante una causa de acción estatuaria por discrimen. Bajo pretexto de que es campo ocupado, la mayoría utiliza el caso antes citado para determinar que una empleada que suscribió un contrato de empleo con una cláusula de arbitraje queda vedada de instar su reclamo de discrimen por razón de sexo ante un tribunal de justicia por su condición de no pertenecer a una unión. A mi juicio, este proceder se aparta de las normas establecidas en nuestra jurisdicción para

la protección de los derechos de las personas trabajadoras en Puerto Rico, pues resulta en un trato desigual e injustificado entre empleados y empleadas que pertenecen a convenios colectivos, y aquellos y aquellas que no.

Mediante jurisprudencia, hemos reconocido el proceso arbitral debidamente pactado como un mecanismo idóneo para dilucidar controversias que surjan de los contratos, las leyes y la Constitución, **salvo medie justa causa** o razones específicas para obviarlo. Vélez v. Serv. Legales de P.R., Inc., 144 DPR 673, 682 (1998). Incluso, con el paso del tiempo el arbitraje se ha convertido en un mecanismo alterno de resolución de conflictos favorecido. Medina v. Cruz Azul de P.R., 155 DPR 735, 738 (2001); Constructora Estelar v. Aut. Edif. Púb., 183 DPR 1, 30 (2011).

La acogida del arbitraje como un método alterno de resolución de conflictos responde en gran parte a la flexibilidad e informalidad que caracteriza este procedimiento.[1] En cuanto a esto, la Corte Suprema federal resaltó que en los foros arbitrales no hay mecanismos formales de descubrimiento de evidencia y que los laudos están sujetos a una revisión judicial limitada. Bernhardt v. Polygraphic Co. of America, 350 US 198, 203 (1956). De este

---

[1] "En los últimos cincuenta años, el arbitraje se ha convertido en el método predominante de resolución de conflictos en los Estados Unidos. Esto se debe, en parte, a lo atractivo que puede ser el arbitraje para las partes [. . .] **Sin embargo, tiene su precio. Las partes en el procedimiento de arbitraje sacrifican los derechos procesales y evidenciarios que les confieren el derecho estatutario y el** *common law***, pero, por otro lado, los tribunales reconocerán los laudos arbitrales como si fueran una sentencia final y firme**". (Citas omitidas) (Negrilla y traducción suplida) S. Boyarsky, *Not What They Bargained for: Directing the Arbitration of Statutory Antidiscrimination Rights*, 18 Harv. Negot. L. Rev. 221, 275-276 (2013).

modo, si una causa de acción se tramitara ante un tribunal de derecho, la empleada o el empleado tendría a su disposición amplios mecanismos de descubrimiento de prueba. Lo anterior tiende a favorecer a la parte demandante, quien acarrea el peso de la prueba para establecer su causa de acción. S. Boyarsky, *Not What They Bargained for: Directing the Arbitration of Statutory Antidiscrimination Rights*, 18 Harv. Negot. L. Rev. 221, 274 (2013).

A su vez, este Tribunal ha adoptado un principio de autorestricción respecto a la revisión de los laudos. Este principio es de tal magnitud que hemos validado que "[l]a deferencia a las determinaciones del árbitro, […] es tan amplia que un laudo no se puede anular por meros errores de hecho o derecho". C.O.P.R. v. S.P.U., 181 DPR 299, 369 (2011) (citando a Febus y Otros v. MARPE Const. Corp., 135 DPR 206, 218 (1994); J.R.T. v. Cooperativa Cafeteros, 89 DPR 498, 503 (1963)).

Ahora bien, en lo pertinente a la controversia de autos, la Corte Suprema federal validó que un empleado o una empleada puede escoger entre el foro arbitral y un tribunal de derecho para tramitar su causa de acción por discrimen racial. Alexander v. Gardner-Denver Co., 415 US 36 (1974). Razonó que, si bien los procedimientos de arbitraje son adecuados para resolver disputas contractuales, las particularidades de este proceso lo convierten en uno inapropiado para dilucidar reclamaciones al amparo del Título VII del *Civil Rights Act of 1964*, 42 USCA sec. 2000e *et seq.*

A tales efectos, reconoció que la informalidad que caracteriza **el proceso arbitral lo convierte en un mecanismo inadecuado para dilucidar controversias sobre discrimen, por lo que lo apropiado es tramitar este tipo de controversia en los tribunales de derecho**. Íd., pág. 59. Asimismo, sostuvo que, si bien los tribunales debían referir al arbitraje las controversias que pudieran surgir del convenio colectivo, **aquellas causas de acción estatutarias debían dirimirse ante los tribunales**. Barrentine v. Arkansas-Best Freight System, Inc., 450 US 728, 738 (1981).[2]

Resulta meritorio resaltar que en Puerto Rico existe un ordenamiento jurídico abarcador en protección de los derechos de las personas trabajadoras. Particularmente, las reclamaciones instadas al amparo de la Ley Núm. 100 del 30 de junio de 1959, según enmendada, también conocida como la *Ley Antidiscrimen de Puerto Rico*, 29 LPRA sec. 146 *et seq.* (Ley Núm. 100), así como la Ley Núm. 17 de 22 de abril de 1988, según enmendada, también conocida como la *Ley Para Prohibir el Hostigamiento Sexual en el Empleo*, 29 LPRA sec. 155 *et seq.* (Ley Núm. 17), son causas de acción estatutarias

---

[2] La Corte Suprema federal reiteró esto en McDonald v. West Branch, 466 US 284, 289 (1984):

> Nuestro rechazo a reconocer una norma de cosa juzgada en *Barrentine* y una regla de deferencia en *Gardner-Denver* se **basa mayormente en nuestra conclusión de que la intención del Congreso federal era de que las leyes que estaban en controversia en esos casos pudieran hacerse valer en los tribunales y que el arbitraje no proveía un sustituto adecuado a los procedimientos judiciales** para la adjudicación de las reclamaciones al amparo de esas leyes. Estas consideraciones igualmente requieren que determinemos que las doctrinas de cosa juzgada e impedimento colateral tampoco se apliquen en esta acción al amparo de la sección 1983. (Citas omitidas) (Negrilla y traducción suplida).

que emanan del mandato constitucional que prohíbe el discrimen por razón de sexo. A tenor con esto, hemos reconocido la facultad de la empleada o del empleado de acudir ante un tribunal para instar una reclamación de discrimen por razón de sexo, independientemente de la existencia de un acuerdo de arbitraje.

Ahora bien, en nuestro ordenamiento coexiste una política pública fuerte a favor de los métodos alternos de resolución de conflictos junto a una legislación laboral amplia que promueve dilucidar las referidas controversias ante un tribunal de justicia. Cuando nos enfrentamos a normas jurídicas o principios de derecho encontrados, es tarea de este Tribunal dirimir qué norma prevalece y qué norma cede. J. Farinacci Fernós, *Hermenéutica puertorriqueña: cánones de interpretación judicial*, San Juan, Ed. InterJuris, 2019, pág. 42. En esta ocasión, en lugar de reconocer las particularidades del derecho laboral puertorriqueño, una mayoría de este Tribunal opta por incorporar erradamente lo dispuesto en Gilmer v. Interstate/Johnson Lane Corp., *supra*, lo cual es un precedente no vinculante. Habida cuenta de esto, entiendo necesario distinguir este caso de la controversia ante nos.

En primera instancia, el análisis de Gilmer v. Interstate/Johnson Lane Corp., *supra*, giraba en torno a si la *Age Discrimination Employment Act* (ADEA, por sus siglas en inglés) no excluía la aplicación de una cláusula de arbitraje debidamente constituida. 29 USC sec. 621 *et seq*.

La Corte Suprema federal determinó que una reclamación instada al amparo de la referida ley puede someterse al arbitraje compulsorio, según pactado en el acuerdo de arbitraje. Gilmer v. Interstate/Johnson Lane Corp., *supra*, pág. 23. No obstante, la mayoría incorpora este dictamen para llevar a cabo un análisis expansivo de la *Federal Administration Act* (FAA, por sus siglas en inglés) y razonar que aplican sus disposiciones al caso de marras, a pesar de que la Corte Suprema federal no basó su determinación en lo estatuido en esta ley.[3] **Al proceder de este modo, la mayoría desaprovechó la oportunidad de llevar a cabo un análisis de la legislación laboral local para brindar una protección mayor a las trabajadoras y a los trabajadores de Puerto Rico.**

En un caso en el que se suscitó una controversia similar a la de autos, a saber, una empleada unionada instó una acción judicial por hostigamiento sexual, acudimos al historial legislativo de la Ley Núm. 17. Vélez v. Serv. Legales de P.R., Inc., *supra*. Razonamos que el remedio provisto por el estatuto es exigible a través del procedimiento judicial, a pesar de que la referida obrera formaba parte de un convenio colectivo que exigía el arbitraje compulsorio. Íd. Igualmente, en esta ocasión, procedía extender por analogía la excepción reconocida mediante jurisprudencia a las reclamaciones que puedan surgir

---

[3] Si bien es cierto que el Congreso federal aprobó la *Federal Administration Act* como una respuesta a la antigua actitud hostil hacia el arbitraje, recalco que, en la actualidad, el arbitraje se ha convertido en un mecanismo favorable para la resolución de conflictos tanto en los Estados Unidos como en Puerto Rico. Véase Medina v. Cruz Azul de P.R., 155 DPR 735, 742 (2001).

bajo la Ley Núm. 100. De lo contrario, nos estaríamos distanciando de un precedente ya establecido sin justificación válida.

Por otro lado, este Tribunal ya estableció que "todo obrero que entienda que tiene causa de acción bajo [la Ley Núm. 100] puede acudir en jurisdicción original a los tribunales para hacer valer tales derechos, sin necesidad de acudir previamente a otro tipo de foro". Quiñones v. Asociación, 161 DPR 668, 676-677 (2004). Recordemos que esta ley no hace distinción alguna entre empleados unionados, públicos o privados. No obstante, la mayoría también descarta lo expuesto en este caso pues razona que es de aplicación únicamente a empleadas unionadas y empleados unionados. Si bien es cierto que el empleado en el caso citado participaba de un convenio colectivo, **esto no implica una exclusión automática de los empleados y de las empleadas que no pertenecen a convenios colectivos**. Resolver de otra manera frustraría el propósito por el cual se promulgó la Ley Núm. 100.

En virtud de la protección constitucional en contra el discrimen y la legislación laboral puertorriqueña, esta controversia representaba una oportunidad para extender lo resuelto en Vélez v. Serv. Legales de P.R., Inc., *supra*, a aquellas reclamaciones al amparo de la Ley Núm. 100. De este modo, procedía confirmar la determinación del Tribunal de Primera Instancia y devolver el caso a ese foro para la continuación de los procedimientos, por ser el foro adecuado

para dilucidar esta causa de acción. Afirmo que nada de lo antes dispuesto se debe interpretar como un ataque al arbitraje como un mecanismo ideal para la resolución alterna de conflictos, sino un reconocimiento de que el foro arbitral no es el foro apropiado para todo tipo de controversia.


                              Maite D. Oronoz Rodríguez
                                   Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Kendall Hope Tucker<br><br>Recurrida<br><br>v.<br><br>Money Group, LLC y otros<br><br>Peticionarios | CC-2024-0391 | Certiorari |

Opinión disidente emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ, a la cual se une la Jueza Presidenta ORONOZ RODRÍGUEZ.

En San Juan, Puerto Rico, a 27 de enero de 2026.

En esta ocasión, una mayoría de este Tribunal desaprovechó la oportunidad de apartarse de un automatismo que redunda en peores condiciones laborales para todos los empleados y empleadas bajo contratos de empleo individuales, quienes representan la inmensa mayoría de la fuerza laboral en Puerto Rico. Al hacerlo se permite nuevamente la práctica patronal de limitar, a través de cláusulas de arbitraje, el acceso de empleados y empleadas a remedios estatutarios en el foro judicial. Igualmente, se consiente que se eludan los procedimientos diseñados por la Asamblea Legislativa para garantizar la justicia laboral. Por no avalar tal actuación, respetuosamente disiento.

En concreto, este caso requería que resolviéramos, esencialmente, dos controversias. Primero, si el contrato de empleo en cuestión, suscrito entre partes individuales, involucra el comercio interestatal de forma tal que resulte aplicable la *Federal Arbitration Act*, *infra*, a su cláusula de arbitraje. Segundo, si, dadas las circunstancias de este caso, el derecho laboral y la jurisprudencia relacionada con el arbitraje, debía forzarse a la parte reclamante a arbitrar sus causas de acción de discrimen por razón de sexo al amparo de la *Ley Antidiscrimen de Puerto Rico*, *infra*, por despido injustificado bajo la *Ley sobre despidos injustificados*, *infra*, y por represalias según la *Ley de represalias*, *infra*.

Adelanto que, a diferencia del curso mayoritario, interpretaría que la *Federal Arbitration Act*, *infra*, no aplica al contrato de empleo de este caso en particular porque no afecta el comercio interestatal. Al igual, no obligaría a las partes a arbitrar en consideración a las normas laborales, contractuales y civilistas que imperan en nuestra jurisdicción.

Con este breve contexto, procedo a examinar las circunstancias procesales más relevantes del caso.

I

Los hechos de este caso son sencillos. La Sra. Kendall Hope Tucker (señora Hope Tucker o recurrida) vendió su propia compañía a Money Group, LLC (Money Group) y, como parte de

ello, suscribieron un *Stock Purchase Agreement*[1] y un *Employment Agreement*[2]. En este último –un contrato de empleo individual– se acordó que la señora Hope Tucker asumiría el puesto de *Head of Data and Strategy* por tiempo indefinido.[3] Las funciones de ese puesto fueron descritas en el *Exhibit B* que acompañó el contrato, el cual estableció:

> JOB DESCRIPTION
> As the Head of Data and Strategy you'll [sic] be responsible for all aspects of the outreach center business unit. You will also be responsible for strategizing on business plans and implementation, lead hiring for high level/strategic roles, manage the outreach center team, aggregate analytics, monitor the earn-out, report to the CEO on progress, coordinate marketing/comms and pinch hit in the business unit as needed.[4]

Asimismo, en el acuerdo se pactó que cualquier disputa relacionada con el empleo se resolvería mediante arbitraje. En específico, en el párrafo 14 del *Employment Agreement* se pautó:

> **14.1 All Disputes**. All Disputes relating to this Agreement and the relationship of the parties hereto shall be settled and finally determined by arbitration in San Juan, Puerto Rico, by, and in accordance with, the Laws of the Commonwealth of Puerto Rico. A single arbitrator situated in San Juan, Puerto Rico shall be used. However, this arbitration shall not apply so as to delay or prevent any judicial or arbitrator's injunctive or

---

[1] Apéndice de la *Petición de certiorari*, págs. 60-236. Este contrato, por su parte, estableció que el foro para litigar controversias surgidas a su amparo sería el Tribunal de Primera Instancia de San Juan. Véase, específicamente, el párrafo 7.11 del *Stock Purchase Agreement*, Íd., pág. 101.

[2] Íd., págs. 237-259.

[3] Véase el párrafo 1 del contrato, titulado *Employment*, Íd., pág. 237.

[4] Íd., pág. 259.

other equitable relief hereunder, which shall be effective immediately subject to the requisite final and binding arbitration with respect thereto which shall be handled concurrently or after such relief is granted.
[…]

**14.3 Authority.** It is agreed that the arbitrator shall have exclusive authority to enter an award for damages or other affirmative relief, including specific performance and injunctive relief, provided that a party may petition the court for enforcement of any award if necessary, and that the arbitrator's award or decision <u>shall be subject to appeal only pursuant to Puerto Rico law regarding these matters</u>.
[…]

**14.5 Costs.** If any action is brought to enforce this Agreement or any provision thereof, the prevailing party shall be entitled to an allowance for reasonable attorney fees, plus costs of arbitration.
[…]

**14.7 Incorporation of Applicable Commonwealth of Puerto Rico Employment Law.** Except to the extent that the terms of this Agreement provide otherwise, the terms and provisions of the Commonwealth of Puerto Rico Law on Employment matters are incorporated in and made part of this Agreement. (Subrayado nuestro, ennegrecido en el original).[5]

También, las partes acordaron en el párrafo 17, titulado *Applicable Law*, lo siguiente: "This Agreement shall in all respects, including all matters of construction, validity and performance, be governed by, and construed and enforced in accordance with, **the laws of the Commonwealth of Puerto Rico**, without regard to any rules governing conflicts of laws". (Ennegrecido nuestro).[6]

---

[5] Íd., págs. 245-246.

[6] Íd., pág. 247.

Luego, quebrantada la relación laboral entre las partes, la señora Hope Tucker demandó a Money Group por despido injustificado, discrimen por razón de sexo y represalias.[7] En su reclamación, también incluyó al Sr. Greg Powel (señor Powel) y al Sr. Ian Robertson (señor Robertson), presuntos ejecutivos de Money Group, a quienes dirigió causas de acción por incumplimiento del *Stock Purchase Agreement* y por daños contractuales.

Oportunamente, Money Group compareció para cuestionar la jurisdicción del Tribunal de Primera Instancia, basándose en la cláusula de arbitraje del párrafo 14 del *Employment Agreement*.[8] A su juicio, la *Federal Arbitration Act* (FAA), 9 USCA sec. 1 *et seq.*, aplica a este contrato de empleo y, por ello, los tribunales están obligados a validar y ejecutar la cláusula de arbitraje contenida en él. En consecuencia, solicitó la desestimación de la demanda.

En cambio, la señora Hope Tucker planteó que, independientemente de la existencia de una cláusula de arbitraje, el Tribunal de Primera Instancia posee jurisdicción para atender reclamos de discrimen por razón de sexo al amparo de la *Ley Antidiscrimen de Puerto* Rico, Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 LPRA sec. 146 *et seq.* (Ley Núm. 100 de 1959). Igualmente, indicó que, en todo caso, únicamente la reclamación en contra de

---

[7] Íd., págs. 36-58.

[8] Íd., págs. 278-288.

Money Group estaría sujeta al arbitraje, pues las reclamaciones en contra del señor Powel y el señor Robertson eran contractuales, no laborales, y surgían del *Stock Purchase Agreement,* no del *Employment Agreement.*[9]

Cifrada la controversia jurisdiccional, el Tribunal de Primera Instancia rechazó la solicitud de desestimación.[10] Para el foro primario, de acuerdo con la doctrina adoptada en *Quiñones v. Asociación*, 161 DPR 668 (2004), la señora Hope Tucker no estaba obligada a arbitrar ni a agotar remedios administrativos en cuanto a las controversias de despido injustificado, discriminatorio y en represalia. También pesó en su criterio que, según resaltó, las partes pactaron en el *Stock Purchase Agreement* que las controversias relacionadas con tal acuerdo serían litigadas ante el Tribunal de Primera Instancia de San Juan.

Por su parte, el Tribunal de Apelaciones denegó expedir un auto de *certiorari* promovido por Money Group para cuestionar el dictamen del foro de primera instancia.

Ante nos, Money Group argumentó que los tribunales inferiores erraron al no desestimar la demanda porque la cláusula de arbitraje les priva de jurisdicción sobre las

---

[9] Según la reclamación, se violentó el *Stock Purchase Agreement* al no otorgársele una suma correspondiente a un *Earnout* pactado allí, toda vez que se le despidió sin justa causa. Además, la recurrida alegó que las acciones de estos provocaron que se incumplieran las promesas realizadas en la negociación, no se lograran las metas pautadas en ese acuerdo e impidieron que ella ejecutara sus ideas dentro de la compañía.

[10] Íd., págs. 312-323.

reclamaciones de la señora Hope Tucker. Es su posición que:
(1) la FAA ocupa el campo respecto a la cláusula de arbitraje
pactada en el *Employment Agreement*, toda vez que afecta el
comercio interestatal; (2) la reclamación de discrimen por
razón de sexo no impide que la cláusula de arbitraje se ponga
en vigor; y (3) *Quiñones v. Asociación*, *supra*, no le confiere
jurisdicción al foro primario, pues no versa sobre contratos
de empleo privados, sino sobre convenios colectivos.

En oposición, la señora Hope Tucker arguyó que la Ley
Núm. 100 de 1959, *supra*, presenta una excepción al arbitraje
en casos de reclamaciones a su amparo. También, sostuvo que
la FAA es inaplicable a la controversia, pues el *Employment
Agreement* no mencionó a la FAA, pero sí incorporó las leyes
de Puerto Rico como el marco jurídico que regiría el contrato
y la relación laboral. En ese sentido, la recurrida
distinguió los hechos de este caso de aquellos de *Aponte
Valentín et al. v. Pfizer Pharm*, 208 DPR 263 (2021), donde
se especificó que el acuerdo de arbitraje se regiría por la
FAA. Según subrayó, el contrato de empleo en cuestión fue
redactado en su totalidad por Money Group y, por ende, la
voluntad de esta no fue que aplicara la FAA, sino las leyes
y reglamentos de Puerto Rico.

Dado este escenario, considero que los foros inferiores
correctamente rechazaron desestimar la reclamación. En
adelante, expondré las razones que motivan ese parecer, no
sin antes repasar el derecho aplicable.

II

A.

Desde 1925, la FAA ha representado un poderoso y extenso mandato federal sobre los estados y territorios de los Estados Unidos que les impone a estos una obligación de reconocer como válidos y obligatorios los acuerdos de arbitraje pactados en contratos que involucren el comercio interestatal. 9 USCA sec. 2. Véase *Southland Corp. v. Keating*, 465 US 1 (1984). En específico, la FAA dispone que:

> [a] written provision in […] **a contract evidencing a transaction involving commerce** to settle by arbitration a controversy thereafter arising out of such contract or transaction […] or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract […] shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract […].(Ennegrecido nuestro). Íd.

En virtud de ello, naturalmente, al momento de evaluar si este estatuto aplica, nos corresponde considerar si el contrato en el que se pactó el arbitraje evidencia una transacción que involucra el comercio interestatal. Lógicamente, la contestación en la negativa a esta interrogante imposibilita la aplicación de la FAA.

Entretanto, la Sección 1 del FAA, 9 USCA sec. 1, define "commerce" como el comercio "[…] among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, […]". Íd.

En el contexto de la FAA, el Tribunal Supremo de los Estados Unidos ha sido generoso al extender el significado de la expresión "involving commerce" para efectos de su mandato. Con relación a ello, la ha equiparado a "affecting commerce" y ha reconocido que su utilización implica la intención del Congreso de ejercer al máximo sus poderes bajo la cláusula de comercio. *Citizens Bank v. Alafabco, Inc*, 539 US 52, 56 (2003); *Circuit City Stores, Inc. v. Adams*, 532 US 105, 115 (2001); *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 US 265, 273-274 (1995); *Perry v. Thomas*, 482 US 483, 490 (1987). Así, el uso de estos términos es más abarcador que el lenguaje de "in commerce", el cual contempla estrictamente personas o actividades dentro del flujo del comercio interestatal. *Citizens Bank v. Alafabco, supra*; *Allied-Bruce Terminix Companies, Inc. v. Dobson, supra*, pág. 273; *U.S. v. American Bldg. Maintenance Industries*, 422 US 271, 283 (1975). De esa forma, se ha permitido que ciertas transacciones estén sujetas al poder del Congreso para regular el comercio interestatal si, en el agregado, la actividad económica en cuestión representaría una práctica generalizada sujeta al control federal o <u>si afecta el comercio interestatal de manera sustancial</u>. Íd., págs. 56-57.

Así lo habíamos reconocido en *S.L.G. Méndez-Acevedo v. Nieves Rivera*, 179 DPR 359 (2010), donde reafirmamos que la aplicación estatal de la FAA se limita únicamente a los contratos en el comercio interestatal. Íd., pág. 370,

*Municipio Mayagüez v. Lebrón*, 167 DPR 713, pág. 721 esc. 7; *Medina v. Cruz Azul de P.R.*, 155 DPR 735, 742 (2001). En ese precedente, explicamos que la FAA se activa solamente cuando las partes **alegan y prueban** que la transacción implicada en la controversia formó parte del comercio interestatal. *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, pág. 371; *Medina v. Cruz Azul de P.R.*, *supra*; *Allied-Bruce Terminix Cos. v. Dobson*, *supra,* págs. 273-274; *Perry v. Thomas*, *supra*.

B.

Dicho lo anterior, en nuestra jurisdicción también existe una importante política pública que favorece el arbitraje como un método alterno para solucionar disputas, incluso aquellas de carácter obrero-patronal. *Landrau Cabezudo et al. v. Puertos et al.*, 2025 TSPR 7, 215 DPR ___ (2025); *Aponte Valentín et al. v. Pfizer Pharm*, *supra*, pág. 282. Esta ha sido promovida como parte del interés del Estado en facilitar vías rápidas, flexibles y menos onerosas que los tribunales para resolver controversias entre partes. *Landrau Cabezudo et al. v. Puertos et al.*, *supra*; *H.R., Inc. v. Vissepó & Diez Constr.,* 190 DPR 597, 605 (2014). Conforme a ello, a través del arbitraje, aquellas partes que válida y voluntariamente lo hayan pactado sustituyen a los tribunales por un árbitro para que este determine todas las controversias de hecho y de derecho que surjan entre ellas. *Íd.*; *Aponte Valentín et al. v. Pfizer Pharm*, *supra*; *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, pág. 368. A tales

efectos, si bien se promueve su uso, el arbitraje únicamente procederá cuando las partes así lo pacten. *Aponte Valentín et al. v. Pfizer Pharm*, *supra*, págs. 282-283; *S.L.G. Méndez-Acevedo v. Nieves Rivera, supra*.

A tenor de esto último, una de las controversias que con frecuencia se suscita es si las partes están obligadas a arbitrar, y la tarea de descifrarlo recae en los tribunales. *Aponte Valentín et al. v. Pfizer Pharm*, *supra*, pág. 283; *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, pág. 367. En el ejercicio de esa responsabilidad, hemos reconocido contadas, pero importantes, excepciones a la obligatoriedad del arbitraje. *Quiñones v. Asociación*, *supra,* págs. 673-674. Entre ellas, cuando:

> (1) una unión falla en su deber de proveer justa representación a sus miembros. *F.S.E. v. J.R.T.*, 111 DPR 505, 516 (1981);
>
> (2) recurrir al arbitraje representa un "acto fútil, un gesto vacío, un paso irreal o imposible". *Hermandad Unión de Empleados v. F.S.E.,* 112 DPR 51, 54 (1982);
>
> (3) se reclama por hostigamiento sexual bajo la *Ley para Prohibir el Hostigamiento Sexual en el Empleo*, Ley Núm. 17 de 22 de abril de 1988, según enmendada, 29 LPRA sec. 155 *et seq.*, pues la intención legislativa clara de ese estatuto era que una persona afectada por ese tipo de actos no estuviera obligada a acudir a ningún otro foro que no fuera el judicial. *Vélez v. Serv. Legales de P.R., Inc.*, 144 DPR 673, 686 (1998);
>
> (4) se trate de una acción por despido discriminatorio y las partes hayan acordado que las disputas se resolverían únicamente frente a un árbitro del Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos (Negociado). *Medina v. Cruz Azul de P.R.*, *supra*;
>
> (5) un empleado unionado reclama por despido discriminatorio al amparo de la Ley Núm. 100 de

> 1959 y cuenta con un convenio colectivo que pactó el arbitraje privado, pues tendrá la opción de escoger entre el foro judicial y el foro arbitral. *Quiñones v. Asociación*, *supra*, pág. 679.

Como es posible observar de este recorrido jurisprudencial, las excepciones a la obligatoriedad del arbitraje se han configurado en casos de remedios estatutarios en virtud de leyes protectoras y, primordialmente, en casos de empleados unionados con convenios colectivos de empleo. Esto, desde mi criterio, además de revelar un trato distinto a los empleados y empleadas bajo contratos de empleo individuales frente a aquellos con convenios colectivos, amerita evaluación. Veamos.

En *Vélez v. Serv. Legales de P.R., Inc.*, *supra*, nos correspondió resolver si una empleada, quien alegó discrimen en el empleo tras informar un incidente de hostigamiento sexual, tenía que acogerse al arbitraje pactado en un convenio colectivo o si, por el contrario, podía recurrir directamente al foro judicial.

En esa ocasión, la demandante era miembro de una unión que tenía un convenio colectivo con el patrono en el que se acordó que las disputas se arbitrarían ante el Negociado. Íd., pág. 681. Sin embargo, el reglamento aplicable al Negociado prohibía el arbitraje de casos por discriminación cubiertos por la Ley Núm. 100 de 1959. Íd. En consideración de que la *Ley para prohibir el hostigamiento sexual en el empleo*, Ley Núm. 17 del 22 de abril de 1988, según enmendada, 29 LPRA sec. 155 *et seq.*, perseguía el mismo propósito que

la Ley Núm. 100 de 1959, resolvimos que el Negociado estaba impedido de intervenir en la controversia y, por lo tanto, que la demandante no tenía que agotar el procedimiento de arbitraje según convenido. Íd., pág. 684.

Pesó en ese análisis la expresión legislativa de que no era necesario agotar remedios administrativos, así como que la intención de la medida era evitar que la persona afectada por hostigamiento sexual tuviera que acudir a un foro en particular antes del judicial. Íd., págs. 684-685. Igualmente, se contempló la decisión de *Alexander v. Gardner-Denver Co.,* 415 US 35 (1974), en la que el Tribunal Supremo de los Estados Unidos determinó que el derecho estatutario de un empleado a solicitar un juicio *de novo* bajo el Título VII de la Ley de Derechos Civiles de 1964 no estaba limitado por una sumisión previa de esa causa ante un árbitro bajo la cláusula antidiscrimen de un convenio colectivo. Íd., pág. 685.

En *Medina v. Cruz Azul de P.R.,* *supra,* atendimos si una empleada unionada, quien demandó por discrimen por razón de su embarazo, podía preterir el arbitraje pactado en el convenio colectivo y acudir directamente a los tribunales. Ante una situación similar a la de *Vélez v. Serv. Legales de P.R.,* *supra,* en la que el convenio colectivo pautaba el arbitraje mediante el Negociado y este, a su vez, no permitía arbitrar causas de discrimen por razón de sexo bajo la Ley Núm. 100 de 1959, este Tribunal determinó que la allí

demandante no tenía que acudir al arbitraje pactado colectivamente. Íd., pág. 743.

En *Quiñones v. Asociación, supra*, se presentó una controversia parecida a las anteriores, pero con un matiz particular y pertinente. En esa ocasión, un empleado unionado reclamó por vía judicial que fue despedido discriminatoriamente por razón de su edad, en violación de la Ley Núm. 100 de 1959. Íd., págs. 670-671. Como el convenio colectivo habido entre las partes mandataba que las disputas se resolvieran frente a un árbitro del Negociado o mediante uno privado, el patrono solicitó la desestimación a favor del arbitraje. Íd., págs. 671-672. Por ello, nos correspondió resolver si un empleado unionado podía acudir <u>directamente</u> a los tribunales para reclamar que su despido fue discriminatorio por razón de edad bajo la Ley Núm. 100 de 1959, aun cuando el convenio colectivo contenía como alternativa el <u>arbitraje privado</u>. Íd., pág. 675. Respondimos en la afirmativa.

Para atender ese caso, acudimos primero al texto y al historial legislativo de la Ley Núm. 100 de 1959, *supra*, para descifrar a quién se le concedió jurisdicción para adjudicar reclamaciones al amparo de esa legislación. Íd., pág. 676. De allí, derivamos que el estatuto imprimió un mandato de política pública claro de que "[t]odo obrero que entienda que tiene [una] causa de acción bajo esta ley puede acudir en jurisdicción original a los tribunales para hacer

valer tales derechos, sin necesidad de acudir previamente a otro tipo de foro". Íd., págs. 676-677. Ello, subrayamos en aquel entonces, era de fácil constatación, puesto que el citado Art. 4 de la Ley Núm. 100 de 1959, *supra*, le otorgó jurisdicción original al Tribunal de Primera Instancia para entender en reclamaciones de discrimen por las razones establecidas en la ley. Íd., pág. 677. Tanto así que sentenciamos:

> A la luz del texto antes citado, resulta forzoso concluir que **no procede** […] **quitarle a los tribunales una facultad que expresamente le concedió el legislador.** No es simplemente que los tribunales tendrán jurisdicción, es que *dicha jurisdicción es original*, es decir, *en su origen, en su[s] inicios, en sus comienzos, en su nacimiento, desde el primer momento en que surja la causa de acción.* Por ser así, no podemos privar al obrero de un foro que le concedió el legislador para reclamar sus derechos por el hecho de que la unión haya pactado someter cualquier disputa laboral al proceso de arbitraje. Máxime, cuando se trata de controversias que involucran elementos subjetivos, de intención y propósitos mentales, donde los tribunales juegan un papel esencial, si no decisivo, para llegar a la verdad. *Soto v. Hotel Caribe Hilton*, 137 DPR 294, 301-302 (1994). El arbitraje no implica la renuncia de derechos. Debe mantenerse presente que el texto claro de una ley es la expresión por excelencia de la intención legislativa. "*En aras de la liberalidad no podemos ir más allá de la ley.*" *Rivera Coll v. Tribunal Superior*, 103 DPR 325, 331 (1975). (Ennegrecido nuestro, bastardillas en el original). Íd., págs. 677-678.

Por todo ello, concluimos que los tribunales conservarían jurisdicción para entender en casos de despido patronal discriminatorio por razón de edad, incluso cuando se haya pactado el arbitraje privado como alternativa. Íd., pág. 676. Así, resolvimos que un empleado unionado, al

momento en que surja una causa de acción al amparo de la Ley Núm. 100 de 1959, tendrá la oportunidad de escoger entre el foro judicial, por disposición de ley, y el foro arbitral privado, por disposición del convenio. Íd., pág. 679.

C.

Sabido es que en nuestra jurisdicción también coexiste una vigorosa política pública de raigambre constitucional que procura garantizar una protección laboral mayor a los trabajadores y las trabajadoras. *Romero et als. v. Cabrer Roig et als.,* 191 DPR 643, 653 (2014); *Cordero Jiménez v. UPR*, 188 DPR 129, 139 (2013). Véase Art. II, Sec. 16, Const. PR, LPRA, Tomo 1. En virtud de ella, el Estado posee un interés apremiante en regular las relaciones entre los trabajadores y los patronos para prever y prevenir prácticas injustas. *Díaz v. Wyndham Hotel Corp.,* 155 DPR 364, 374 (2001). De ahí que se haya promulgado una multiplicidad de leyes protectoras de los derechos de los trabajadores, ya sean contratados de forma individual o colectiva.

Entre estos estatutos, se destacan, por su pertinencia, la Ley Núm. 100 de 1959, *supra*; la *Ley sobre despidos injustificados*, Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 LPRA sec. 185a *et seq.*; y la *Ley de represalias*, Ley Núm. 115 de 20 de diciembre de 1991, según enmendada, 29 LPRA sec. 194 *et seq.*

En lo que nos atañe, el Art. 1 de la Ley Núm. 100 de 1959, 29 LPRA sec. 146, prescribe que todo aquel patrono que

despida o discrimine contra un empleado suyo por razón de sexo, entre otras características, incurrirá en responsabilidad civil e, incluso, en responsabilidad penal. Este articulado permite que, como parte del remedio civil, se condene al patrono al pago de una suma igual al doble del importe de los daños que el acto discriminatorio le haya causado al empleado o empleada. Entretanto, para hacer valer esa disposición, así como el resto de sus preceptos, el Art. 4 de la Ley Núm. 100 de 1959, 29 LPRA sec. 149, le otorga al Tribunal de Primera Instancia **jurisdicción original** en los casos que surgieren bajo esa ley.

Asimismo, el Art. 4 también les extiende a los empleados la posibilidad de: (1) tramitar su reclamación civil por acción ordinaria o a través del procedimiento de querella de la *Ley de Procedimiento Sumario de Reclamaciones Laborales*, Ley Núm. 2 de 17 de octubre de 1961, según enmendada, 32 LPRA sec. 3118 *et seq.*[11]; (2) acumular en una sola acción

---

[11] Este no es un beneficio cualquiera. La *Ley de Procedimiento Sumario de Reclamaciones Laborales* fue promulgada para viabilizar que las reclamaciones en contra de patronos se tramitaran de manera sumaria, dado el interés público de que los trabajadores tengan acceso adecuado al Poder Judicial para hacer valer sus derechos y en consideración de la desventaja de estos frente a su patrono. *Vizcarrondo Morales v. MVM, Inc.,* 174 DPR 921, 928-929 (2008). Además del carácter expedito de una acción al palio de esta legislación, también se proveyeron como beneficios: la satisfacción de oficio de las costas del proceso; el pago por el patrono de honorarios de abogado; la acumulación de causas y de obreros querellantes; la participación del Secretario del Departamento del Trabajo y Recursos Humanos; la mayor amplitud posible en la presentación de prueba; la prohibición de desestimación de querellas por defectos de forma únicamente; y el proceso apelativo sumario.

todas las reclamaciones que tuvieran varios o todos los trabajadores en contra de un patrono; (3) contar con el Secretario del Trabajo y Recursos Humanos para que demande en su representación y para su beneficio en reclamo de cualquier suma que se le adeude o del cumplimiento de los derechos provistos por la ley; y (4) recibir del Tribunal el pago de costas y una suma razonable para honorarios de abogados.

Por otra parte, la antes descrita política pública a favor de los derechos de los trabajadores y las trabajadoras también ha provocado que, al abordar una controversia que nos genere dudas en cuanto a la aplicabilidad de una legislación laboral, estemos llamados a interpretar el estatuto de forma amplia cuando le conviene al trabajador y de manera restrictiva cuando le afecta. *Cardona Caraballo v. ACT,* 196 DPR 1004, 1017 (2016); *Romero et als. v. Cabrer Roig et als., supra*, pág. 653. Véase, también, J. Farinacci Fernós, *Hermenéutica puertorriqueña: cánones de interpretación judicial*, San Juan, Ed. InterJuris, 2019, pág. 253. Así, la exclusión de un empleado de los beneficios de una ley laboral debe ser clara y se debe interpretar restrictivamente. *Cardona Caraballo v. ACT, supra; López Santos v. Tribunal Superior*, 99 DPR 325, 330 (1970). Véase, también, J. Farinacci Fernós, *supra*.

III

A.

Visto lo anterior, para que una disputa entre dos partes tenga que ser obligatoriamente arbitrada por mandato de la FAA, es requerido que el contrato evidencie una transacción que involucre el comercio interestatal. Soy del criterio de que esa condición no se cumple en esta ocasión. Veamos.

En primer orden, de un análisis del *Employment Agreement* surge que la señora Hope Tucker ocuparía el puesto de *Head of Data and Strategy*, cuyas labores se describieron sin referencia expresa a asuntos que involucraran el comercio interestatal. Por el contrario, únicamente se le designó como responsable de cierta unidad de negocios, planes y estrategias de negocio, contrataciones de alto nivel, manejo del equipo del *outreach center*, análisis de datos y coordinación de mercadeo y comunicaciones. Estas funciones no están inherente ni sustancialmente relacionadas con el comercio interestatal.

En segundo orden, estamos ante un contrato de empleo que, reiteradamente, preceptúa que las leyes aplicables al acuerdo serán las de Puerto Rico. Tanto así que el *Employment Agreement* dispone que serán las leyes locales las que aplicarán tanto en términos generales, en el párrafo 17, como en términos específicos al arbitraje, en el párrafo 14.7. Esto, a mi juicio, delimita claramente la extensión del contrato de empleo en este caso y opera en contra de la

conclusión de que alberga una transacción que involucra el comercio interestatal.

En tercer orden, en contraste de su específica y repetida mención de la aplicabilidad de las leyes de Puerto Rico, el *Employment Agreement* no hace referencia alguna a la FAA e, incluso, tampoco menciona expresamente negocios, transacciones o labores a llevarse a cabo en otros estados o territorios de los Estados Unidos. Todavía más, me parece desacertado concluir que el contrato de empleo expone que la señora Hope Tucker sería responsable de contribuir al desarrollo de Money Group a través del comercio interestatal, pues una aseveración expresa a esos efectos no surge de una lectura del documento.

De igual manera, el hecho de que Money Group sea una compañía que ofrezca servicios en distintos estados de los Estados Unidos no es, por sí solo, suficiente para resolver que el contrato de empleo involucra el comercio interestatal. Lo importante es que el contrato evidencie una transacción que involucre el comercio interestatal, no así la compañía. En efecto, lo contrario nos podría llevar a pensar que el contrato de un gerente de una tienda de venta al detal afecta el comercio interestatal por el mero hecho de que la compañía nacional que lo emplea tiene presencia en los Estados Unidos y en Puerto Rico. En ese sentido, al auscultar este aspecto jurisdiccional, miraría primordialmente aquello que el contrato dispone que hará el

empleado, así como las demás providencias del acuerdo. Por tal razón, a diferencia de la posición prevaleciente en este Tribunal, hubiese concluido que de la faz del *Employment Agreement* no se puede deducir que la transacción subyacente en él involucra el comercio interestatal. **Máxime cuando nos encontramos bajo el estándar aplicable para atender una solicitud de desestimación.**

Por todo ello, en vez de desestimar a favor del arbitraje por mandato de la FAA, hubiese considerado si la señora Hope Tucker estaba obligada a arbitrar a la luz de nuestra legislación laboral local.

### B.

En atención a la amplia política pública en protección de los derechos laborales y en contra del discrimen en el empleo, así como a la legislación habilitadora de esta, soy del criterio de que, en reclamaciones por despido discriminatorio y en represalias, el arbitraje no debería ser mandatorio, independientemente de que haya sido pactado en un contrato de empleo privado. Así, le hubiese puesto fin a la diferencia que se le ha dado a la cláusula de arbitraje en el contrato de empleo privado *vis a vis* el convenio colectivo, para la cual no encuentro razón legislativa o jurídica de peso que justifique sostenerla. En lugar del curso de acción mayoritario, hubiese reconocido la facultad de la señora Hope Tucker de, una vez surgida su causa de acción, escoger entre dos foros para hacer valer su

reclamo: el arbitral, por virtud del *Employment Agreement*, y el judicial, al amparo de la Ley Núm. 100 de 1959. Me explico.

En primer lugar, la Ley Núm. 100 de 1959, *supra*, es clara en cuanto le otorga al Tribunal de Primera Instancia **jurisdicción original** en los casos que surgieren bajo ese estatuto. Cuando la letra de la ley es clara y no arroja ambigüedades, su texto no debe menospreciarse. Véase el Art. 19 del Código Civil de Puerto Rico de 2020, 31 LPRA sec. 5341. El texto claro de la ley es la expresión por excelencia de la intención legislativa. *Quiñones v. Asociación*, *supra*, pág. 678. Ese mismo texto nos sirvió en *Quiñones v. Asociación*, *supra*, para forzosamente concluir que no hay cabida para quitarle a los tribunales la jurisdicción que la Asamblea Legislativa diáfanamente les otorgó. Y no podía ser para menos. El tipo de jurisdicción promulgado en el estatuto es original, desde el primer momento en que surge la causa de acción, y, por lo tanto, no corresponde despojar a los trabajadores del foro legislativamente concedido, sea su contrato de empleo uno individual o colectivo.

Además, frente a la naturaleza del arbitraje, la Ley Núm. 100 de 1959, *supra*, provee remedios que son incompatibles con ese método alterno de resolución de conflictos. Entre estos se encuentra la posibilidad de tramitar su causa bajo la Ley Núm. 2 de 1961, *supra*; la acumulación de las reclamaciones y de los trabajadores como

reclamantes; la participación del Secretario del Trabajo y Recursos Humanos; el pago de costas; y el pago de una suma razonable para honorarios legales.

El arbitraje, en contraste, suele imponerle gastos al empleado, pues las partes se dividen los costos de árbitro, entre otros. Más todavía, por ejemplo, en el arbitraje pactado en este caso, en virtud de su párrafo 14.5, la parte que prevalezca tendrá derecho a recibir una cantidad razonable por concepto de honorarios de abogado y de costos del arbitraje. Es decir, que, por hacer valer su reclamación de despido discriminatorio por razón de sexo, la señora Hope Tucker estaría expuesta a satisfacer los honorarios legales de Money Group, en adición al costo del arbitraje. Esa es una situación impermisible e impensable frente al procedimiento legal que dispone la Ley Núm. 100 de 1959, *supra*, para sancionar el discrimen en el empleo. Esta división de los gastos, así como otras características del arbitraje, plantean un severo disuasivo o *chilling effect* sobre la vindicación de los derechos laborales de los empleados. Este resultado sería manifiestamente contrario a la ley y a la política pública antidiscrimen en el empleo.

En segundo lugar, no existe razón de peso para limitar lo que resolvimos en *Quiñones v. Asociación*, *supra*, a los empleados unionados contratados bajo convenios colectivos. Por el contrario, enfrentados ante una reclamación de discrimen por razón de sexo, o por cualquier otra razón bajo

la Ley Núm. 100 de 1959, *supra*, y una cláusula de arbitraje privado en un contrato de empleo individual, se presentan inclusive mayores méritos para extender la norma allí pautada.

Por un lado, el carácter colectivo del convenio no fue la razón de ser que llevó a que, en *Quiñones v. Asociación*, *supra*, se conservara la jurisdicción original del foro judicial sobre las causas de acción de discrimen bajo la Ley Núm. 100 de 1959.[12] Lo fue la letra clara de la ley. Igualmente, lo fue la realidad de que este tipo de causa de acción involucra elementos subjetivos, de intención y de propósitos mentales, en los que los tribunales juegan un papel esencial para llegar a la verdad. *Quiñones v. Asociación*, *supra*, pág. 678; *Soto v. Hotel Caribe Hilton*, 137 DPR 294, 301-302 (1994).

Por otro lado, incluso si el asunto del convenio colectivo fuera determinante en esta controversia, no es posible soslayar que, frente a los empleados unionados,

---

[12] Más aún, si miramos *Vélez v. Serv. Legales de P.R., Inc.*, *supra*, y *Méndez v. Cruz Azul de P.R.*, *supra*, la razón de que allí se permitiera el litigio de las causas de acción respondió a que se había pactado que el Negociado arbitraría la controversia, pero por disposición reglamentaria estaba impedido de hacerlo. En otras palabras, tampoco respondió estrictamente al carácter colectivo del convenio que pactó el arbitraje. Véase también *Méndez Jiménez v. Carso Const.*, 202 DPR 554, 563 (2019) (Opinión de Conformidad del Juez Asociado señor Martínez Torres) ("En las otras ocasiones en las que hemos reconocido excepciones [al cumplimiento previo de la obligación de arbitrar], hemos basado nuestro razonamiento en que las disposiciones de las leyes y los reglamentos que rigen las controversias respectivas expresamente prohíben el arbitraje").

quienes contaron con el beneficio de una organización que los representara y una negociación colectiva protegida constitucionalmente, los empleados bajo contrato de empleo individual no poseen tales beneficios y ventajas. Como cuestión de hecho, la mayoría de los trabajadores y trabajadoras se enfrentan a una situación de "o lo tomas o lo dejas" al momento de ser contratados. Por eso, con más razón, les debería aplicar la norma que detallamos en *Quiñones v. Asociación, supra*.

En este último respecto, tampoco podemos obviar las disposiciones de nuevo cuño relativas a los contratos de adhesión, codificadas en los Arts. 1248 y 1249 del Código Civil de 2020, 31 LPRA sec. 9802-9803. En virtud de ellos, las cláusulas de contratos, cuyo contenido predispuesto una parte ha tenido que aceptar, deberán ser interpretadas en sentido desfavorable hacia la parte que las redactó y de forma favorable hacia la que se vio obligada a aceptar su contenido. De hecho, el Art. 1249 del Código Civil de 2020, *supra*, designa como anulable aquellas cláusulas de un contrato de adhesión en las que se "le prohíbe o limita al adherente la interposición de acciones". 31 LPRA sec. 9803(g).

Los contratos individuales de empleo, así como sus cláusulas de arbitraje, son mayoritariamente contratos de adhesión, cuyas condiciones raramente están sujetas a negociación. En el caso ante nos, como en muchos otros, se

podría presentar un contrato de adhesión con una cláusula de
arbitraje que, ciertamente, según el criterio adoptado por
una mayoría de este Tribunal, limita la interposición de
acciones judiciales por la parte con menos poder en la
relación contractual y laboral. Acciones, huelga repetir,
que fueron creadas por la Asamblea Legislativa en la búsqueda
de atender el discrimen en el empleo. Esas circunstancias
ameritaban mayor estudio y consideración por este Tribunal,
especialmente dada su importancia en el contexto de nuestros
estatutos contractuales y jurisprudencia interpretativa.

Por último, en este extremo, si las leyes protectoras
en cuestión no hacen una distinción entre el tipo de empleado
cobijado por ellas, ¿por qué perpetuarla mediante un
dictamen judicial? Y es que ni siquiera la Ley Núm. 100 de
1959, ni la Ley Núm. 2 de 1961 –ni la Ley Núm. 80 de 1976,
ni la Ley Núm. 115-1991, por cierto– crean una distinción
determinante entre el tipo de contrato de empleo en el que
se encuentra un empleado. Es decir, ninguno de los estatutos
aplicables diferencia entre una empleada contratada de forma
individual y un empleado unionado. Recordemos que al momento
de decidir si una ley laboral protege a un empleado o si,
por el contrario, este está excluido de su aplicación, nos
corresponde interpretar el estatuto ampliamente a favor del
trabajador y restrictivamente su exclusión, la cual debe
surgir claramente del estatuto. *Romero et als. v. Cabrer
Roig et als.*, *supra*. Véanse, también, *Aponte Valentín et al.
v. Pfizer Pharm*, *supra*, págs. 302-303 (Opinión Disidente del

Juez Asociado señor Estrella Martínez); *López Santos v. Tribunal Superior*, *supra*.

En vista de ello, debimos aprovechar la oportunidad para ponerle fin al trato desigual que se le ha dado a los empleados y a las empleadas en Puerto Rico según el carácter de su contratación. Con ello, le daríamos verdadero efecto a los fines perseguidos por la Ley Núm. 100 de 1959 y la Ley Núm. 2 de 1961. La clara política pública a favor del arbitraje no nos puede llevar, nuevamente, a soslayar la aún más vigorosa política pública de favorecer a los empleados y empleadas en sus reclamaciones laborales, ni la expresión de la Asamblea Legislativa contenida en esos estatutos.

Aprovecho, además, para puntualizar que, en miras a que las reclamaciones de la señora Hope Tucker en contra de los señores Powel y Robertson son contractuales y se relacionan al *Stock Purchase Agreement*, no hubiese desestimado en cuanto a estos, toda vez que ese contrato designó expresamente al Tribunal de Primera Instancia de San Juan como el foro para atender controversias surgidas a su amparo.[13]

IV

Por los fundamentos expuestos, respetuosamente disiento del curso de acción adoptado por este Tribunal. Soy del

---

[13] Véase, específicamente, el párrafo 7.11 del *Stock Purchase Agreement*, Apéndice de la *Petición de certiorari*, pág. 101.

criterio de que, en este caso en particular, la FAA no era de aplicación y que, en reclamaciones de despido discriminatorio y en represalias, el arbitraje no debería ser mandatorio, independientemente de que haya sido pactado en un contrato de empleo privado. Por ello, en vez de desestimar en cuanto a Money Group para dar paso al arbitraje, hubiese confirmado a los foros inferiores y devuelto el caso al Tribunal de Primera Instancia para la dilucidación de todas las causas de acción.

Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Kendall Hope Tucker

    Recurrida

      v.                     CC-2024-0391      *Certiorari*

Money Group, LLC y otros

    Peticionarios

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 27 de enero de 2026.

Del curso de acción seguido por una mayoría de mis compañeras y compañeros de estrado en el presente caso, disentimos. Ello, por entender que lo previamente pautado por este Tribunal en *Quiñones v. Asociación de Condómines Playa Azul II,* 161 DPR 668 (2004), es, a todas luces, extensivo a controversias como la de autos; entiéndase, a reclamaciones laborales instadas al amparo de la Ley Núm. 100 de 30 de junio de 1959, también conocida como la *Ley Antidiscrimen de Puerto Rico*, 29 LPRA sec. 146 *et seq.* (en adelante, "Ley Núm. 100"), en esta ocasión, por trabajadoras y trabajadores no unionados.

Como es harto conocido, en *Quiñones v. Asociación de Condómines Playa Azul II*, *supra*, determinamos que una obrera o un obrero unionado podía acudir directamente a los tribunales para reclamar un despido discriminatorio por razón de edad, aun cuando en el Convenio Colectivo se hubiese acordado que las disputas laborales serían dirimidas mediante arbitraje. *Íd.* pág. 680. Para arribar a la anterior conclusión, este Tribunal examinó el alcance del Art. 4 de la Ley Núm. 100, *infra*, el cual, entre otras cosas, establece que "[tanto] [e]l Tribunal de Primera Instancia[,] [como] el Tribunal de Distrito tendrán jurisdicción original concurrente en los casos que surgieren bajo esta ley". 29 LPRA sec. 149. A partir de dicho lenguaje, correctamente razonamos que nuestra Asamblea Legislativa confirió expresamente a los tribunales la facultad de atender una causa de discrimen laboral desde el inicio del reclamo. *Quiñones v. Asociación de Condómines Playa Azul II*, *supra*, pág. 677.

**Si bien es cierto que este Tribunal reconoció lo anterior en el contexto de una trabajadora o un trabajador unionado, en casos como los que hoy nos ocupan, resulta aún más apremiante reconocer ese mecanismo de acceso judicial, pues el obrero o la obrera, -- que no ha formado parte de una negociación colectiva --, carece de las protecciones inherentes a dicho proceso. Como cuestión de hecho, así históricamente lo habíamos determinado en otros escenarios de similar naturaleza.**

Sobre el particular, debemos tener presente la "inherente desigualdad que caracteriza la relación obrero-patronal, en donde el patrono, por su capacidad económica, posee mayor poder que el trabajador individual que necesita de su empleo para sobrevivir". *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 902 (2011). Puesto de otra forma, en el ámbito laboral, el patrono parte, como regla general, de una posición de ventaja estructural frente a la persona trabajadora.

Precisamente, en atención a esa desigualdad, el ordenamiento jurídico puertorriqueño reconoce que las relaciones laborales pueden desarrollarse en dos esferas distintas: (1) la colectiva y (2) la individual. *C.O.P.R. v. S.P.U.*, 181 DPR 299, 351-352 (2011) (Fiol Matta, opinión disidente). En la esfera colectiva, los trabajadores y las trabajadoras se organizan sindicalmente con el propósito de negociar condiciones de empleo más equitativas. *Íd.* pág. 352. En ese sentido, mediante dicho proceso de negociación colectiva, se intenta transformar una relación originalmente dispar en una más balanceada. *Íd.* págs. 353-354.

**Por el contrario, cuando la relación laboral se desarrolla en la esfera individual, la ausencia de ese mecanismo correctivo mantiene la balanza inclinada en favor del patrono. En tales casos, es este último quien, de ordinario, se encarga de configurar los términos y condiciones del contrato laboral.** *Íd.* pág. 352. **A su vez, el obrero o la obrera, con escaso o ningún margen de negociación,**

**se ve compelido a aceptar las condiciones impuestas como requisito para acceder al empleo. Nada tan desventajoso como eso.**

Así pues, a la luz de estas consideraciones, no podemos avalar la postura de una mayoría de este Tribunal en cuanto a la inaplicabilidad de lo resuelto en *Quiñones v. Asociación de Condómines Playa Azul II*, *supra,* a la causa de epígrafe. Dicho proceder, -- **el cual se fundamenta en la adopción automática de un pensamiento jurídico que se ha desarrollado en la jurisdicción federal, con el que el juez que suscribe no coincide** --, ignora tanto el texto claro de la ley, como el precedente aplicable, y priva de una protección estatutaria fundamental a un sector particularmente vulnerable de la fuerza laboral puertorriqueña. Por ello, como ya mencionamos, disentimos.

Ángel Colón Pérez
Juez Asociado
